## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| SEAN FLYNN, | * | |
| Plaintiff, | * | |
|  | * | |
| v. | * | Civil No. 25-1529-BAH |
| KONE INC., | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM OPINION

Plaintiff Sean Flynn ("Flynn" or "Plaintiff") brought suit against KONE Inc. ("KONE" or "Defendant") alleging employment discrimination and retaliation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§ 951 et seq. ECF 1. Pending before the Court are Defendant's motion for sanctions, ECF 42, motion to seal, ECF 44, and motion for summary judgment, ECF 50. Plaintiff opposes the motion for sanctions and motion for summary judgment. ECF 46 (opposition to ECF 42); ECF 53 (opposition to ECF 50). Defendant has filed replies. ECF 47; ECF 54. All filings include memoranda of law, and some filings include exhibits.[1] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025).

---

[1] The Court typically references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page. However, it appears that an error occurred upon the filing of Plaintiff Flynn's deposition, which is attached to KONE's motion for summary judgment as Exhibit E (ECF 50-6), and there are no ECF-generated page numbers on the filing. The Court will cite to Flynn's deposition as "Pl.'s Dep." and reference the page numbers at the top of the page.

Accordingly, for the reasons stated below, KONE's motion for summary judgment is **GRANTED**, KONE's motion for sanctions is **DENIED**, and KONE's motion to seal is **GRANTED**.

## I.    BACKGROUND

### A.    Factual Background

KONE specializes in the maintenance, service, and repair of elevators and escalators. ECF 50-2 (deposition of Matthew English), at 5, 10:16–18. During the relevant time period, the Mid-Atlantic district of KONE consisted of five branch offices in Baltimore, Maryland; Philadelphia and Harrisburg, Pennsylvania; Washington, D.C.; and Richmond, Virginia. ECF 50-2, at 5, 10:21–11:6.

Flynn began working for KONE as a service superintendent[2] at the Philadelphia branch in October of 2014. Pl.'s Dep., at 13, 52:7–10, at 14, 53:21–54:1. At that time, Flynn reported directly to Matthew English, who is now the district service manager for KONE. ECF 50-2, at 4, 9:7–12, at 6, 15:8–11. According to English, Flynn had some performance issues while working under English in Philadelphia. *Id.* at 6, 16:4–20; *see also id.* at 6, 16:19–20 ("A lot of these issues were also evident when he worked for me in Philadelphia.").

Flynn left KONE in June of 2016 to work at another elevator company. Pl.'s Dep., at 14, 53:21–54:6. Flynn was "let go" from that job and came back to KONE in September of 2019 as a repair superintendent in the Baltimore branch. *Id.* at 14, 54:14–16, at 15, 57:4–7; *see also* ECF 50-7, at 2 (September 2019 offer letter from KONE); ECF 50-8, at 2. Flynn's job involved a one-hour and forty-minute commute, *id.* at 16, 61:20–22, and "quite a bit" of time in the field servicing clients in the Baltimore and Northern Maryland area, *id.* at 16, 64:2–13. He was supervised by Nicole McKenzie ("McKenzie"), *id.* at 17, 67:12–17, and English also had "dotted-line" authority

---

[2] The parties use the words "superintendent" and "supervisor" interchangeably to describe Flynn's various roles at KONE.

2

over Flynn, ECF 50-2, at 6, 14:11–17. At the beginning, Flynn and McKenzie's relationship was amicable. Pl.'s Dep., at 17, 67:18–20.

Beginning in at least 2021, Flynn "struggled with performing [his] duties adequately; specifically relating to responding via email in an appropriate time frame," "scheduling of testing," "communicat[ing] in office with other office personnel," and being unreachable. ECF 50-2, at 6, 15:21–16:12. Sometime in 2021, Flynn was placed on a performance improvement plan, or a "coaching plan," to address these "various metrics and other soft skills . . . that [Flynn] was not adequately performing in." *Id.* at 6–7, 17:25–18:6. English and McKenzie collaborated to create the coaching plan and submitted it to Alice Heinz in Human Resources. *Id.* at 7, 18:2–6; *see also* ECF 50-9 (the "2021 coaching plan"), at 2–4; Pl.'s Dep., at 19–20, 76:21–77:22, ECF 50-21 (deposition of Alice Heinz), at 8, 24:16–24. Flynn successfully completed the 2021 coaching plan. ECF 50-2, at 7, 19:21–22; Pl.'s Dep., at 28:22–29:2.

Around September of 2021, Flynn went on leave under the Family and Medical Leave Act ("FMLA") for his mental health. Pl.'s Dep., at 21, 81:21–82:6; ECF 50-24, at 2. He met with McKenzie prior to going on leave to go "through any open items" and then started inpatient treatment. Pl.'s Dep, at 21, 82:17–83:2. Flynn was then diagnosed with, and received treatment for, general anxiety disorder and major depressive disorder. Pl.'s Dep., at 21, 82:3–8. In January of 2022, Flynn requested accommodations to return to work as recommended by his treating psychiatrist—specifically, a hybrid work schedule involving teleworking three days per week. Pl.'s Dep., at 23, 90:2–18; *see also* ECF 50-10 (letter from Flynn's psychiatrist), at 2. Flynn's doctor recommended that the accommodation begin on January 12, 2022 and end on January 31, 2022, "when he can return to his full-time schedule." ECF 50-10, at 2. Flynn met with McKenzie

3

to request his accommodation before returning to work, and his accommodation was granted. Pl.'s Dep., at 23, 91:2–7, at 24, 93:8–20.

In April of 2022, after Flynn's return from medical leave, English informed Flynn that he would be moved from his position as repair superintendent to a maintenance, or service, superintendent job. Pl.'s Dep., at 17–18, 68:22–70–22. His compensation, benefits, work location, and supervisor remained unaltered, Pl.'s Dep., at 18, 69:10–28, but his duties were different and included skills that English believed would "better utilize [Flynn's] strengths and would not require skills that were Mr. Flynn's weaknesses." ECF 50-11 (declaration of English), at 2. For example, while Flynn was a repair superintendent, English "observed that [Flynn] struggled to create work orders proactively for the technicians under his supervision," and "had difficulty creating accurate estimates" for customers. *Id.* at 2–3. Flynn would no longer be required to complete these sorts of tasks as a service superintendent. *Id.* at 3.

At some point during his employment at KONE, Flynn's relationship with McKenzie began to deteriorate. According to Flynn, he had "many conversations with Mr. English," about Flynn's "inability to make any headway with Mrs. Mc[K]enzie," including that she "became an incredibly difficult person to work with." Pl.'s Dep., at 19, 74:10–19. Flynn complained to English that he "felt that [McKenzie] was unfairly hard on him," and "calling him out unfairly on . . . things," although English felt that "the things that [Flynn] was being called out for . . . were valid." ECF 50-2, at 7, 20:16–25. Flynn, however, never shared his mental health diagnoses with English, and English does not recall Flynn stating that McKenzie's treatment of him was based on his mental disability. *Id.* at 8, 22:4–7, 23:14–23.

Flynn was apparently not alone in his dislike of McKenzie. At least five other employees at KONE complained to English about McKenzie, including that she treated them unfairly and in

4

a demeaning manner and spoke to them in an inappropriate and condescending tone. *Id.* at 8–9, 25:10–27:10; Pl.'s Dep., at 37, 148:1 ("She's rude to everybody."). In fact, McKenzie's employment with KONE was eventually terminated based on her "unsatisfactory behavior in . . . how she was interacting with her team," ECF 50-21, at 7, 20:12–16, including her "use of an inappropriate and unprofessional tone while speaking to employees," ECF 50-22, at 2 (warning letter to McKenzie regarding her "unacceptable" behavior towards KONE employees). *See* ECF 50-23, at 2 (termination recommendation based on "employee complaints and unprofessional behavior").

With respect to Flynn's performance, he continued to struggle and was placed on a coaching plan developed by McKenzie and English in July of 2022. *Id.*; ECF 50-2, at 7, 19:23–20:9; ECF 50-14 (the "2022 coaching plan"). The 2022 coaching plan identified areas of improvement, solutions, measures of improvement, and included progress notes. ECF 50-14, at 2–3. Areas of improvement involved, among other things, Flynn's failure to timely complete mandatory testing for hydro-elevators, approve time tickets daily for his supervisees, complete various audits, complete installs of KONE's 24/7 technology software, and communicate with customers in a timely manner. ECF 50-14, at 2–3. Progress notes show that Flynn made some improvements, *see, e.g., id.* at 2 ("To confirm[ ]daily time approval has occurred daily email was requested[.] Sean communicated completed but those were not reco[r]ded in Weekly report as completed. 90% completion[,] 6 behind."), but not consistently across the board, *see, e.g., id.* ("NO process audits completed MTD."; "24/7 installs not achieved.")

Customer emails also reflect deficiencies with Flynn's performance. For example, on July 28, 2022, Theresa Shackelford, a representative from Baltimore County Public Schools ("BCPS"), one of KONE's "largest accounts," ECF 50-15, at 2, emailed Flynn and noted some issues with an

elevator unit at a school and asked Flynn to "have someone look at this school and order parts and repair it as needed," as Shackelford wanted "to get this unit inspected as soon as possible." ECF 50-16, at 8. This email was forwarded to McKenzie by Christine Bradshaw, a Senior Project Manager,[3] who asked McKenzie to "make this a priority please" because some of the items listed in Shackelford's email had been "pending for months." *Id.* at 6–7. On September 14, 2022, Bradshaw followed up because the issues had "not been resolved," and noted that she was directed "to deduct the maintenance fee for this school from the invoices for September and moving forward until resolved." *Id.* at 5. On October 4, 2022, McKenzie asked Flynn: "What is the status? I have to follow up with [Bradshaw] as annual testing is due and violations have not been cleared from last inspection. . . . What is the material status and timeline for repair?" *Id.* at 2. Flynn did not respond. *Id.* Additionally, on August 31, 2022, Shackelford sent an email to McKenzie including a lengthy list of elevator issues that were "months old and . . . have not been repaired." ECF 50-17, at 2. Shackleford asked that Flynn work to address these items and "look at the failed inspection forms that I have sent to him and provide [her] with updated inspection." *Id.* at 3.

BCPS is not the only customer that seemingly had an issue with Flynn's services. On August 3, 2022, Mark Gaunt, a representative from Boscov's, emailed Flynn about several cracks in an escalator handrail. ECF 50-19, at 4. Flynn responded that same day that he would "get them measured and ordered up." *Id.* But on September 28, 2022, Gaunt followed up with Flynn, copying McKenzie, and asked for an update as to whether "we have the Handrails" and "the work [is] on the schedule[?]" *Id.* at 3. Flynn responded, "Will do – we will be finalizing the schedule tomorrow during our ops meeting and I will let you know the date." *Id.* McKenzie emailed Flynn separately and wrote "Have these even been ordered? Who was this communicated to?" *Id.* at 2.

---

[3] It is not clear from the record whether Bradshaw works for BCPS, KONE, or another entity.

6

On October 7, 2022, McKenzie emailed Flynn, "Order and schedule status?" *Id.* Flynn did not respond to either of McKenzie's emails.

On September 6, 2022, McKenzie emailed Katelynn Munive with KONE's Human Resources department, copying English, and requested to "proceed with a 30 Day Warning level." ECF 50-15, at 2. McKenzie indicated that "[a]lthough [Flynn] has made some progress on the noted items, he continues to not meet the metrics that are required." *Id.* For example, McKenzie detailed that "[c]ustomer communication has improved with response being provided via email to 90% of customer requests. However, the actions communicated are not being performed or completed as described." *Id.* McKenzie also identified that audits and testing remained past due, and "actions detailed" regarding shutdown units "are not being driven to completion. As a result, units remain out of service for longer periods of time." *Id.*

On September 19, 2022, Flynn received a final warning letter from McKenzie. ECF 50-18, at 2. McKenzie wrote that while Flynn had "made some progress on the noted items, [his] performance is still not at the level required and expected at KONE." *Id.* Several performance deficiencies were identified, including that there were 33 hydro-elevator tests still past due, audits not completed on time, and that "several items . . . were not completed as promised" for BCPS. *Id.* Flynn was advised of the expectation that "beginning immediately, you will execute your performance plan and improve performance, demonstrating significant progress and meeting established goals no later than 10/19/2022," and that failure to "meet and sustain this expectation may lead to further disciplinary action, up to and including termination." *Id.*

On October 11, 2022, Munive emailed McKenzie that Flynn's "final warning deadline is next week," and noted that, based on McKenzie's updates about Flynn, "it doesn't sound like he has met the expectations set for him in that letter." ECF 50-20, at 3. Munive asked if McKenzie

wanted "to move forward with termination." *Id.* McKenzie responded on that same day, "In speaking with [English], we are in agreement that this is the next step. What is the process that needs to occur?" *Id.* at 2. On October 13, 2022, Munive replied that Flynn's "termination is approved." *Id.* Munive advised McKenzie to wait until October 19, 2022 to "have the conversation" because that was the deadline set in his final warning letter. *Id.* McKenzie responded on Tuesday, October 18, 2022, "Matt and I will be proceeding on Thursday morning," October 20, 2022. *Id.*

But before McKenzie and English could speak with Flynn about his termination, Flynn sent an email to Heinz and Nicole Manzo in KONE's Human Resources office. ECF 50-24, at 2. In his October 19, 2022 email, Flynn submitted a "request for consideration of transfer of work locations due to the management and unhealthy, hostile, and toxic work environment in the Baltimore office." *Id.* Flynn indicated that, in December of 2020, KONE "moved two account managers between the Baltimore and Washington, DC locations" due to McKenzie's management. *Id.* In this email, Flynn attributed his 2021 medical leave to "the mental and emotional distress caused by the work environment and behavior fostered by" McKenzie, and stated that his need for mental health treatment was a "direct result of the hostile work environment [he has] endured for the past three years." *Id.* Flynn also wrote: "Furthermore, my performance is being unjustly evaluated based on my disclosure of my mental health treatment and that I am being discriminated against based on my physical and/or mental handicap." *Id.* Flynn requested to be transferred to a vacant elevator service supervisor position in the Philadelphia branch. *Id.* This was not the only time that Flynn brought up the idea of transferring to the Philadelphia branch. Flynn had previously raised the topic with English, but English "told him it wouldn't happen until he was able to do his job in Baltimore." ECF 50-2, at 10, 31:21–32:7.

8

In his email to Human Resources requesting the transfer, Flynn also requested "a full investigation of the caustic work environment in the Baltimore Branch." ECF 50-24, at 2. After receipt of the email, KONE placed Flynn on administrative leave and conducted an investigation. ECF 50-21, at 6, 15:21–16:22; Pl.'s Dep., at 30, 117:9–12. The investigation concluded around December of 2022, and it was found that "no discriminatory action was taken." *Id.* at 6, 17:11–23. Flynn then returned to work and was informed that "based on the performance improvement plan, [his] employment was terminated." Pl.'s Dep. 39, at 39, 153:12–154:4.

## B.    Procedural Background

Flynn filed his complaint in the U.S. District Court for the Eastern District of Pennsylvania on January 6, 2025. ECF 1. On April 9, 2025, KONE filed a motion to transfer venue to the United States District Court for the District of Maryland, ECF 16, which was granted on May 12, 2025, ECF 19. The parties commenced discovery, and on December 8, 2025, KONE filed a motion for sanctions, accusing Flynn of spoliating evidence. ECF 44. Then, on February 19, 2026, KONE filed its motion for summary judgment. ECF 50. Both pending motions are fully briefed and ripe for resolution.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists." *Progressive Am. Ins. Co. v. Jireh*

*House, Inc.*, 608 F. Supp. 3d 369, 372 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986)). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court "may not make credibility determinations or weigh the evidence," *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)). For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)). "The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials, without more, are insufficient to withstand a summary judgment motion." *Progressive Am. Ins.*

*Co.*, 608 F. Supp. 3d at 372 (citing *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

## III.    ANALYSIS

### A.    Motion for Summary Judgment (ECF 50)

Flynn alleges that KONE is liable for discriminatory and retaliatory termination in violation of the ADA and the PHRA. "The PHRA is to be 'construed consistently with other relevant [f]ederal and [s]tate laws and regulations except where the construction would operate in derogation of the purposes of the [PHRA].'" *Morgan v. Allison Crane & Rigging LLC*, 114 F.4th 214, 221 n.21 (3d Cir. 2024) (alterations in *Morgan*) (quoting 16 Pa. Code § 44.2(b)). Accordingly, "federal courts should . . . interpret the PHRA in harmony with the ADA." *Id.* As such, the Court considers Flynn's claims under the ADA and the PHRA under the ADA's legal standards. *See Steed v. Geisinger Health*, No. 4:22CV1773, 2025 WL 2101963, at *4 n.3 (M.D. Pa. July 25, 2025) (addressing a "plaintiff's ADA and PHRA claims collectively under the same legal standard").

"The ADA and PHRA prohibit employers from discriminating 'against a qualified individual on the basis of disability.'" *Morgan*, 114 F.4th at 220 (quoting 42 U.S.C. § 12112(a)). Under the ADA, a "disability" is defined as "a physical or mental impairment that substantially limits one or more major life activities," "a record of such an impairment," or "being regarded as having such an impairment." 42 U.S.C. § 12102(1); *see also Equal Emp. Opportunity Comm'n v. Manufacturers & Traders Tr. Co.*, 429 F. Supp. 3d 89, 102 (D. Md. 2019). A "qualified individual" is one who, "with or without reasonable accommodation, can perform the essential functions of the employment position that [the] individual holds or desires." 42 U.S.C. § 12111(8). Among the forms of discrimination prohibited by the statute are (1) imposing an adverse action upon an employee due to their disability; (2) retaliating against an employee for engaging in

11

protected activities related to disability discrimination; and (3) creating a hostile work environment. *See Israelitt v. Enter. Servs. LLC*, 78 F.4th 647, 653 (4th Cir. 2023) (recognizing each type of claim under the ADA).

"When a plaintiff alleges that h[is] employer unlawfully discriminated or retaliated against h[im] in violation of the ADA, []he can prove h[is] claim through direct and indirect evidence. Otherwise, the plaintiff may proceed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)." *Laird v. Fairfax Cnty.*, 978 F.3d 887, 892 (4th Cir. 2020) (citing *Jacobs*, 780 F.3d at 572, 577). *McDonnell Douglas* sets out a three-step scheme in which the plaintiff bears the initial burden of establishing a prima facie case of discrimination by a preponderance of the evidence. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996). If the plaintiff meets this burden, the defendant-employer can rebut the presumption of discrimination by presenting evidence of a legitimate, non-discriminatory reason for its employment actions. *Id.* If the defendant-employer provides this reason, the presumption of discrimination "drops out of the picture" and the burden shifts back to the plaintiff to demonstrate that the defendant's rationale is pretextual. *Id.* At bottom, the "plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against h[im]." *Id.* (citing *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)). Here, because Plaintiff presents no direct evidence of discrimination, he proceeds under the three-step *McDonnell Douglas* framework. *See Greene v. ICON Gov't & Pub. Health Sols.*, No. 24-1647, 2025 WL 1589254, at *1 (4th Cir. June 5, 2025).

### 1.    Discrimination

#### i.    *Termination*

Flynn claims that he was unlawfully terminated in violation of the ADA and PHRA. ECF 1, at 7. A plaintiff alleging unlawful discrimination under the ADA must establish that he (1) is a

12

"qualified individual with a disability"; (2) was "discharged"; (3) was "fulfilling his employer's legitimate expectations at the time of discharge"; and (4) the "circumstances of his discharge raise a reasonable inference of unlawful discrimination." *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012) (citation modified). Here, KONE does not dispute that Flynn satisfies the first two elements as he is a qualified individual with a disability and was discharged from his position at KONE. ECF 50-1, at 19. KONE argues, however, that Flynn cannot establish the third and fourth elements of his disability discrimination claim. *Id.*

The Court concludes that Flynn has failed to make a prima facie showing that he was meeting his employer's legitimate expectations when he was discharged. Flynn contends that he was meeting KONE's legitimate expectations based on evidence that he "had successfully completed the 2021 coaching plan and was showing improvement in 2022." ECF 53-1, at 8. However, the record reflects that Flynn's employment record with KONE was plagued with performance deficiencies over a number of years. *See Warch v. Ohio Casualty Ins. Co.*, 435 F.3d 510, 517–18 (4th Cir. 2006) (holding that an employee who had been put on probation after a string of negative reviews related to multiple areas of his job performance failed to show that he was meeting his employer's legitimate job expectations).

English testifies that many of Flynn's performance deficiencies were evident long ago, "when [Flynn] worked for [English] in Philadelphia," including that Flynn "struggled with performing the duties adequately" such as "responding via email in an appropriate time frame," "individual repair jobs that he oversaw," "scheduling of testing," and "communications in the office with other office personnel, not being able to reach him and get ahold of him." ECF 50-2, at 6, 16:3–20. In 2021, Flynn was placed on a coaching plan because of "various metrics and other soft skills . . . that [Flynn] was not adequately performing in." *Id.* at 7, 18:2–6; *see also* ECF 50-

9. Flynn made the requisite improvements and successfully completed that plan, but in 2022 was placed on another coaching plan for similar "reasons [as] the 2021 coaching plan." ECF 50-2, at 7, 20:2–9. This track record is not one that establishes satisfactory work performance.

Flynn argues that he was making improvements on the 2022 plan, and these purported improvements are sufficient to establish a prima facie case that he was meeting KONE's expectations. ECF 52-1, at 8. But the evidence that Flynn points to shows that even if Flynn made "some progress" on aspects of his coaching plan, ECF 50-15, at 2, he also showed "regression," ECF 50-2, at 7, 20:10–15, and "continue[d] to not meet the metrics that [we]re required," ECF 50-15, at 2. For example, English explains that he observed "minimal improvement from Mr. Flynn" while he was on the 2022 coaching plan, and notes that "Flynn failed to approve his technicians' time entries daily as required," "consistently failed to complete [required] audits," "struggled with tracking the installations of" certain products, and "struggled with both internal and external communication." ECF 50-11, at 3–4 ¶¶ 15–21. "[I]n cases in which the plaintiff had an ongoing history of poor job performance, courts have analyzed that deficiency as a failure to satisfy the *prima facie* case element of meeting the employer's legitimate expectations." *Gordon v. Holy Cross Hosp. Germantown, Inc.*, 385 F. Supp. 3d 472, 479 (D. Md. 2019), *aff'd,* 780 F. App'x 84 (4th Cir. 2019). Here, the evidence bears out that Flynn had an ongoing history of deficient performance. And despite any unspecified improvement that Flynn may have been making, Flynn does not point to any evidence showing any supervisors were satisfied with his work such that a factfinder could infer that he was meeting expectations at the time of his termination. *Cf. Huang v. Gutierrez*, Civ. No. AW-08-2882, 2010 WL 93274, at *7 (D. Md. Jan. 5, 2010) (finding a plaintiff established a prima facie case of the third element of a discrimination claim where, despite

14

some evidence that the defendant was not satisfied with the plaintiff's work, the plaintiff "point[ed] to other admissible evidence that her employer was satisfied with her work").

"Although on summary judgment an employer is free to assert that the job expectation prong has not been met, nothing prohibits the employee from countering this assertion with evidence that demonstrates (or at least creates a question of fact) that the proffered 'expectation' is not, in fact, legitimate at all." *Warch*, 435 F.3d at 517. "Thus, where application of the qualification or expectation element of the prima facie case seems to preclude an otherwise meritorious claim, the plaintiff is free to demonstrate that the employer's qualifications or expectations are not, in fact, 'legitimate.'" *Id.* Flynn attempts, but fails, to rebut KONE's evidence of his performance deficiencies. He argues that KONE's expectations were not legitimate, and points to his own email to Manzo and Heinz, wherein Flynn makes the accusation that his "performance is being unjustly evaluated based on [his] disclosure of [his] mental health treatment." ECF 50-24, at 2. But Flynn points to no other evidence in the record that supports a reasonable inference that his performance was unfairly assessed or that the expectations imposed upon Flynn were not legitimate. *Cf. Huang*, 2010 WL 93274, at *8 (finding that testimony that plaintiff was treated worse than other employees, held to different standards than her peers, and was nitpicked by a supervisor raised "questions as to the legitimacy of the expectations" of plaintiff's supervisors); *see also Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 650–51 (4th Cir. 2021) (finding an issue of material fact as to the legitimacy of the employer's asserted expectations where the employee presented evidence that the employer rated her performance highly, and gave her awards, a salary raise, and an equity grant). Without more than a single email from Flynn expressing concerns about the work environment, the Court cannot conclude that a reasonable jury could find KONE's expectations were not legitimate. *Cf. King v. Rumsfeld*, 328

15

F.3d 145, 149 (4th Cir. 2003) ("King's own testimony, of course, cannot establish a genuine issue as to whether King was meeting appellee's expectations.").

Moreover, it is apparent from the record that Flynn's performance was measured against KONE's legitimate expectations based on its industry and customer needs. For example, even though Flynn improved his customer communication in accordance with the 2022 performance plan, *see* ECF 50-14 ("Respond to all emails and phone calls within 24 hours"), Flynn failed to perform the actions communicated to the customer—specifically for one of KONE's largest accounts, BCPS. ECF 50-15, at 2. The email thread with BCPS spanning from July 2022 to October 2022, wherein Flynn was unresponsive to BCPS's needs and requests, confirms as much. *See* ECF 50-16. As does the email thread with Boscov's, where Flynn completely dropped the ball on his promise to repair the escalator handrails at Boscov's. *See* ECF 50-19, at 4 (Flynn emailing, "I will get them measured and ordered up" to the customer on August 4, 2022), at 2 (McKenzie asking for "Order and schedule status?" on October 7, 2022). KONE is in the business of servicing elevators and escalators. Its expectations for Flynn to timely carry out requests for such services and to respond to his supervisor's inquiries about such requests is plainly legitimate.[4]

Accordingly, the Court concludes that Flynn has failed to adduce evidence to show that KONE's "expectations were a sham designed to hide the employer's discriminatory purpose . . .

---

[4] Even if Flynn had established a prima facie case here, his deficient performance would qualify as a legitimate, non-discriminatory reason for his termination. *Williams v. Complete Care Servs., Inc.*, 21 F. App'x 106, 107 (4th Cir. 2001). Moreover, even if there was any evidence that raised "a dispute as to whether there was a discriminatory reason that Defendant decided to terminate Plaintiff," that would "not suffice to defeat summary judgment on a discrimination claim under the ADA; the discriminatory reason must be 'more than *a* motivating factor: it must be *the only* motivating factor.'" *Peterson v. Cap. One, N.A.*, 705 F. Supp. 3d 484, 496 (D. Md. 2023) (quoting *Davis v. W. Carolina Univ.*, 695 F. App'x 686, 688 (4th Cir. 2017)) (emphasis in *Davis*). "If an employer acts with a mixed motive—both a discriminatory and non-discriminatory reason—then the employer is not liable." *Davis*, 695 F. App'x at 688.

or were somehow not legitimate." *Warch*, 435 F.3d at 518 (citation modified). "Thus, even when viewing the evidence in the light most favorable to [Flynn], we conclude that no reasonable jury would find that he was meeting [KONE]'s legitimate performance expectations." *Id.* For these reasons, Flynn's discriminatory termination claim fails.

### ii. Failure to Accommodate

Another "form of discrimination prohibited by the ADA is a failure to make a reasonable accommodation." *Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314, 322 (4th Cir. 2011). "A reasonable accommodation is one that (1) 'enables [a qualified] individual with a disability . . . to perform the essential functions of [a] position,' . . . or (2) 'enable[s] [an] employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by . . . other similarly situated employees without disabilities.'" *Hamel v. Bd. of Educ. of Harford Cnty.*, Civ. No. JKB-16-2876, 2018 WL 1453335, at *10 (D. Md. Mar. 23, 2018) (quoting 29 C.F.R. § 1630.2(o)(1)(ii)–(iii)). The elements of a failure to accommodate claim are: "(1) the employee was an individual with a disability within the meaning of the ADA; (2) the employer had notice of the disability; (3) with reasonable accommodation, the employee could perform the essential functions of the position; and (4) the employer refused to make such accommodations." *Manufacturers & Traders Tr. Co.*, 429 F. Supp. 3d at 103 (citing *Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001)).

Here, Flynn argues that KONE failed to accommodate his disability by refusing to grant his request for reassignment to other open positions in the company.[5]  ECF 53-1, at 10.

---

[5] Plaintiff does not bring his failure to accommodate claim based on the temporary hybrid work schedule accommodation he requested in January of 2022. *See* ECF 53-1, at 12–13. Nor could he, since that accommodation was granted by KONE. *See Jennings v. Frostburg State Univ.*, 679 F. Supp. 3d 240, 284 (D. Md. 2023) ("Notably, the fourth element of the prima facie case requires that the employer actually refuse to make the reasonable accommodation.").

17

Specifically, in October of 2022, Flynn requested transfer to a position in Philadelphia, where he would no longer be working under McKenzie. ECF 50-2, at 10, 31:21–25; ECF 50-24, at 2 ("I request consideration for a transfer of work locations due to the management and unhealthy, hostile, and toxic work environment in the Baltimore office."). While it is undisputed that Flynn requested a transfer to Philadelphia, KONE contends that Flynn's reasonable accommodation claim fails because 1) the requested accommodation was not reasonable; and 2) Flynn's initial request was not framed as an accommodation related to his disability. ECF 54, at 5.

KONE characterizes Flynn's request for transfer as "a request to change managers," and argues that such a request is not considered a reasonable accommodation. ECF 54, at 5. But Flynn requested a transfer to a vacant position in the Philadelphia office, not just transfer to a different supervisor. ECF 50-2, at 10, 32:23–33:3 (testifying that Flynn requested a transfer to an "open position in Philadelphia"); ECF 50-24, at 2 ("I request transfer to the vacant and posted Elevator Service Supervisor position in the Philadelphia branch."). So while "courts, including this one, have been reluctant to conclude that a request to change supervisors to address stress or anxiety amounts to a 'reasonable' accommodation," *Abdelkhalek v. Worksource Montgomery*, Civ. No. PX-25-01438, 2026 WL 369252, at *4 (D. Md. Feb. 10, 2026), "reassignment to a vacant position" is expressly contemplated under the ADA as a "reasonable accommodation." *See* 42 U.S.C. § 12111(9)(B). The Court therefore concludes that Flynn's request for a transfer could be considered a reasonable accommodation under the ADA.

This finding does not end the analysis. "The burden of identifying an accommodation that would allow a qualified individual to perform the job rests with the plaintiff, as does the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable." *Lamb v. Qualex, Inc.*, 33 F. App'x 49, 59 (4th Cir. 2002). "A reasonable accommodation is one

that is feasible or plausible." *Searls v. Johns Hopkins Hosp.*, 158 F. Supp. 3d 427, 435 (D. Md. 2016) (quoting *Reyazuddin v. Montgomery Cnty., Maryland*, 789 F.3d 407, 414 (4th Cir. 2015)). "The reasonableness of an accommodation depends on whether it 'enables the employee to perform the essential functions of the job in question.'" *Id.* (quoting *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995)).

Thus, Flynn has the burden of presenting evidence that the transfer would have been an accommodation that was feasible or plausible for KONE. *Abler v. Mayor & City Council of Baltimore*, Civ. No. BPG-18-3668, 2022 WL 824850, at *7 (D. Md. Mar. 18, 2022), *aff'd*, No. 22-1630, 2023 WL 7984741 (4th Cir. Nov. 17, 2023). He attempts to show that a transfer was plausible for KONE by pointing to a non-disabled colleague who was permitted "to transfer from Baltimore to Washington, D.C. as a result of the environment caused by Ms. McKenzie." ECF 53-1, at 11. "Relevant to a determination of whether the accommodations made or refused in any particular case are reasonable is the employer's past actions towards employees who are in a similar situation to the plaintiff." *Abler*, 2022 WL 824850, at *8 (quoting *Taylor v. Gilbert & Bennett*, No. 95-C-7228, 1997 WL 30948, at *2 (N.D. Ill. Jan. 15, 1997)). In general, "to establish a valid comparator, the plaintiff must produce evidence that the plaintiff and comparator 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223–24 (4th Cir. 2019) (quoting *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010)).

The only evidence that Plaintiff has offered related to the proposed comparator—Mariah Copp—is that she was also supervised by McKenzie and was permitted to transfer. *See* ECF 1, at 4; ECF 50-24, at 2. Otherwise, Flynn contends that to his "knowledge and belief," Copp was

19

"nondisabled" and "had lower metrics than Plaintiff." ECF 53-3, at 4. But an affirmation upon information and belief is insufficient to support denial of summary judgment. *See Malina v. Baltimore Gas & Elec. Co.*, 18 F.Supp.2d 596, 604 n. 4 (D. Md. 1998) (affidavits based upon information and belief are insufficient to support or oppose summary judgment); *see also Pryce v. Bd. of Educ. for Prince George's Cnty.*, Civ. No. DKC-07-3284, 2009 WL 10681228, at *6 (D. Md. July 6, 2009) (finding an "'unsupported speculation' that other teachers were treated differently . . . insufficient to withstand a motion for summary judgment"). And the record contains no evidence about Copp that supports Flynn's assertion that she was "nondisabled," "had lower metrics than" Flynn, or was similarly situated in any other way that would establish her as a valid comparator. Moreover, Flynn was informed he would not be permitted to transfer for performance reasons—specifically, English stated, "I told him [a transfer] wouldn't happen until he was able to do his job in Baltimore." ECF 50-2, at 10, 32:6–7. As such, no evidence shows that transferring Flynn was feasible or plausible under these circumstances. *See Wirtes v. City of Newport News*, 996 F.3d 234, 241 (4th Cir. 2021) (stating that "reassignment is a disfavored accommodation that employers are generally under no *obligation* to offer" (emphasis in original)).

Even if Flynn were able to show that his accommodation request was reasonable, his accommodation claim would still fail because Flynn fails to proffer any evidence, or even allege, that the accommodation he requested was needed for him to perform the essential functions of his position in light of his disabilities.[6] "An employer's obligations under the ADA are triggered for those accommodations necessary for the plaintiff to perform the essential functions of [his] job."

---

[6] KONE also argues that Flynn's discrimination claim is doomed because Flynn's request for transfer came after the decision to terminate him was already made. ECF 54, at 5–6. However, the Court finds this temporal issue more relevant to Flynn's retaliation claim and will therefore discuss it in more detail in that section. *See infra* Section III.A.2.

*Simmons v. UM Cap. Region Health, Inc.*, Civ. No. PX-21-2074, 2021 WL 4806336, at \*4 (D. Md. Oct. 14, 2021) (citing *Fierce v. Burwell*, 101 F. Supp. 3d 543, 550 (D. Md. 2015)). "Essential functions" are "the fundamental job duties of the employment position." 29 C.F.R. § 1630.2(n)(1). But "an employer's failure to provide an accommodation is only actionable if the accommodation would 'alleviate disability-induced limitations that impact an employee's job-related activities.'" *Simmons*, 2021 WL 4806336, at \*4 (quoting *Hamel*, 2018 WL 1453335, at \*12). "'A causal relationship' between the disability and the accommodation, therefore, is essential to the success of the claim," *id.* (quoting *Fierce*, 101 F. Supp. 3d at 550), "or, in other words, [that] 'the requested accommodation was *necessary* in order for [him] to perform the essential functions of [his] job,'" *Shivers v. Saul*, Civ. No. JKB-19-2434, 2020 WL 7055503, at \*5 (D. Md. Dec. 2, 2020) (quoting *Fierce*, 101 F. Supp. 3d at 550) (emphasis in *Fierce*).

Perhaps a transfer may have helped to mitigate some of Flynn's anxiety and depression symptoms because he would be removed from what he characterized as an "unhealthy and toxic work environment." ECF 50-24, at 2. However, there is no evidence tending to show that Flynn needed to transfer in order to perform the essential functions of his role. *Cf. Fierce*, 101 F. Supp. 3d at 550 (finding no denial of a reasonable accommodation because, even though teleworking might have alleviated the plaintiff's depression, there was no evidence that the plaintiff was required to telework to perform her job). In fact, Flynn testifies the reason he wanted to transfer was not to alleviate any limitations related to his disability, but instead because he "wasn't a quitter" and "wasn't just going to let Mrs. Mc[K]enzie win." Pl's Dep., at 28, 109:10–17. Otherwise, Flynn has failed to put forth any evidence that his depression or anxiety caused any limitations on his ability to perform the essential functions of his role, or that transfer would have alleviated any such limitations. *Cf. Hamel*, 2018 WL 1453335, at \*14 ("The fact that Plaintiff has

21

Ehlers-Danlos Syndrome and working at EES may have exacerbated the symptoms of her condition is not itself justification for a transfer (or any other accommodation). To the contrary, 'it is the *limitation arising from the disability* that determines the need for accommodation, not merely the existence of the disability.'" (emphasis in *Hamel*) (quoting *Long v. Howard Univ.*, 439 F. Supp. 2d 68, 78 (D.D.C. 2006))). Accordingly, summary judgment is granted to KONE on Flynn's discrimination claim.

### 2.    Retaliation

Flynn's complaint alleges retaliation resulting from his engagement in "protected activity" and/or his request for a reasonable accommodation. ECF 1, at 9. To succeed on a retaliation claim brought under the ADA, a plaintiff must show: "(1) []he has engaged in protected conduct; (2) []he suffered an adverse action after engaging in the protected conduct; and (3) there was a causal link between the protected conduct and the adverse action." *Peterson v. Cap. One, N.A.*, 705 F. Supp. 3d 484, 497 (D. Md. 2023) (quoting *Laird*, 978 F.3d at 892 n.4). Flynn's termination is the adverse action upon which he bases his claims. 42 U.S.C. § 12112(a) (prohibiting discrimination against qualified individuals on the basis of disability in certain employment actions, including the "discharge" of employees). But it is not entirely clear which of Flynn's purported protected activities or requests for accommodation allegedly *caused* the termination. *See* ECF 53-1, at 12–13.

Flynn cannot base his retaliation claim on his October 19, 2022 email wherein he complained of discrimination "based on [his] physical and/or mental handicap" and requested to transfer to another branch. ECF 50-24, at 2. While KONE concedes this email qualifies as a protected activity, the company had already determined on October 11, 2022 that termination was the "next step" for Flynn, and Flynn's termination was approved by Human Resources two days later, on October 13, 2022. ECF 50-20, at 2. This timeline of events, which goes undisputed by

22

Flynn, makes retaliation factually impossible. *See Baqir v. Principi*, 434 F.3d 733, 748 (4th Cir. 2006) (holding that an employer must have known about an employee's protected activity in order to have engaged in unlawful retaliation); *see also Buchhagen v. ICF Int'l, Inc.*, 650 F. App'x 824, 830 (4th Cir. 2016) (holding that "an employment action cannot be adverse when the action was contemplated before the protected activity occurred").

To the extent Flynn rests his retaliation claim on his FMLA leave or request for a hybrid work schedule upon his return, such a claim would also falter because he fails to establish causation. As noted, the decision to terminate Flynn was made in October of 2022. Plaintiff took FMLA leave around September of 2021, *see* Pl. Dep., at 21, 81:17–21, at 28, 112:19–21; ECF 50-24, at 2, and his request for hybrid work accommodations was made in January of 2022, *see* ECF 50-10 (doctor's letter requesting hybrid work dated January 6, 2022); Pl. Dep., at 23, 90:2–18. The lengthy temporal gap between these events negates any inference of causation. *Lowman v. Maryland Aviation Admin.*, Civ. No. JKB-18-1146, 2019 WL 133267, at *8 (D. Md. Jan. 8, 2019) (noting that "[t]he Fourth Circuit has held that three to four months is too long" of a temporal gap to support causation for a retaliation claim (citing *Pascual v. Lowe's Home Centers, Inc.*, 193 F. App'x 229, 233 (4th Cir. 2006)). Accordingly, KONE is entitled to summary judgment on Flynn's retaliation claim.

KONE posits that Flynn might be basing his retaliation claim on a purported complaint made to English in September of 2022. ECF 54, at 7. Specifically, Flynn avers in his affidavit that he told English that McKenzie was "discriminating against [him] and harassing" him. ECF 53-2, at 3. In order for this complaint to qualify as a protected activity, Flynn must have effectively communicated to English "a belief that the employer has engaged in . . . a form of employment discrimination." *Fraser v. Kaiser Found. Health Plan of Mid-Atl. States, Inc.*, Civ. No. BAH-21-

3276, 2025 WL 755794, at *10 (D. Md. Mar. 10, 2025) (quoting *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009)). "[W]here the employer understood or should have understood that the plaintiff opposed an unlawful practice, that opposition is protected activity." *Id.* at *11 (quoting *Bowman*, 173 F. Supp. 3d at 248). But where a plaintiff merely complains of general unfair treatment, such a complaint will not constitute a protected activity. *Id.*

"To determine whether a defendant should have understood the complaint to constitute a protected activity, a court must consider whether the defendant could have understood the complaint in the context in which it was made." *Holloway v. Maryland*, Civ. No. RDB-20-377, 2024 WL 1075414, at *10 (D. Md. Mar. 12, 2024). The details Flynn provides about his complaint to English in September of 2022 would not "leave h[is] employer understanding that Plaintiff was opposing an action []he believed to be in violation of the ADA," *Fraser*, 2025 WL 755794, at *11, especially in light of the fact that Flynn never shared that he had any disability with English, *see* ECF 50-2, at 8, 22:4–7. Moreover, Flynn's complaints to English centered on McKenzie being "unfairly hard on" Flynn, and that he "felt she was calling him out unfairly" on certain things related to his performance. *Id.* at 7, 20:16–25. No other evidence shows that Flynn suggested to English that his mental health motivated McKenzie's conduct or that he was making a complaint pursuant to the ADA, or that Flynn ever made any reference to discrimination or harassment when speaking with English.[7]

---

[7] The Fourth Circuit has previously concluded in the context of a retaliation claim that an employer should have known that an employee's complaint "likely encompassed sexual harassment" where the employee titled her written complaint as a "*Harassment* Complaint" and described the complained of conduct as "unethical," "degrading and dehumanizing," and explicitly complained of "*harassment*." *Okoli v. City Of Baltimore*, 648 F.3d 216, 224 (4th Cir. 2011) (emphases in original). Like circumstances are not present here. Aside from Flynn's own characterization of his complaint to English about McKenzie, *see* ECF 53-2, at 3 (averring in his declaration that he complained to English about McKenzie "discriminating against [him] and harassing [him]"), no other evidence tends to show that Flynn described any conduct to English as discriminatory or

24

Even if the Court were to conclude that Flynn engaged in a protected activity and could establish a prima facie case of retaliation based on a complaint to English, his retaliation claim would still fail because KONE has offered a legitimate, nondiscriminatory reason for Flynn's termination. "[W]hen an employer gives a legitimate, non-discriminatory reason for discharging the plaintiff, 'it is not [the Court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.'" *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) (quoting *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)). And, as discussed above, Flynn has not presented any evidence showing that KONE's stated reasons for terminating him were not legitimate reasons for his discharge. Accordingly, the Court concludes that Flynn has failed to produce sufficient evidence to survive summary judgment on his retaliation claim. KONE's motion for summary judgment will be granted.

### B.    Motion for Sanctions (ECF 42)

Prior to filing its motion for summary judgment, KONE moved for sanctions based on spoliation of evidence. ECF 42. "The Court retains inherent authority, as well as the discretion as circumscribed by Rule 37 of the Federal Rules of Civil Procedure, to sanction discovery violations." *Barreto v. SGT, Inc.*, Civ. No. PX-17-2716, 2019 WL 3253373, at *3 (D. Md. July

---

harassing on the basis of his disability. While a plaintiff need not use "magic words" such as discrimination or harassment for a complaint to be understood as one for employment discrimination, *Okoli*, 648 F.3d at 224 n.8, he must provide sufficient information to put an employer on notice that the complaint involves allegedly discriminatory conduct. *Cf. Wilson v. Nash Edgecombe Econ. Dev., Inc.*, No. 5:19-CV-322-FL, 2020 WL 5594538 (E.D.N.C. Sept. 18, 2020) (dismissing a retaliation claim because the court was unable to ascertain based on the facts alleged whether the employer understood that the plaintiff was opposing alleged discrimination when opposing her salary decrease). Here, English attests, and Flynn does not dispute, that Flynn only complained that he felt he was being treated unfairly and never raised his disability with English at any time. ECF 50-2, at 8, 22:4–7, at 7, 20:16–25. As Flynn has not offered sufficient evidence that English was on notice of any complaint of employment discrimination, KONE cannot be liable for retaliation based on this conversation.

19, 2019) (citing *Victory Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 517 (D. Md. 2010)),

*aff'd*, 826 F. App'x 267 (4th Cir. 2020). "Before imposing sanctions for spoliation of evidence,

the movant must demonstrate that:

> [T]he party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a culpable state of mind; and (3) the evidence that was destroyed or altered was relevant to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it."

*Id.* (internal quotation marks omitted) (quoting *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d

494, 509 (D. Md. 2009)).

KONE argues that Flynn failed to preserve relevant text messages and requests an adverse

jury inference along with attorneys' fees and costs as sanctions for the alleged spoliation. ECF 42,

at 12–13. However, given that summary judgment has been granted in KONE's favor and there

is no need for any adverse jury inference, the Court will deny the motion as moot. *See CSAA

Affinity Ins. Co. v. Scott Fetzer Co.*, 665 F. Supp. 3d 741, 749 n.4 (D. Md. 2023) ("Because the

Court grants judgment in favor of Defendant Wayne Water and the case will not proceed to trial,

it need not resolve Wayne Water's Motion for Sanctions for Spoliation."); *see also United States

ex rel. Fadlalla v. DynCorp Int'l LLC*, Civ. No. PX-15-1806, 2025 WL 2772021, at *18 (D. Md.

Sept. 29, 2025) (granting judgment in favor of Defendants and thus denying as moot a request for

an adverse inference based on spoliation of evidence); *Parrott v. Maryland Dep't of Lab.,

Licensing, & Regul.*, Civ. No. JFM-13-3568, 2015 WL 1606897, at *1 n.1 (D. Md. Apr. 7, 2015)

(denying a motion for discovery sanctions as moot in light of granting summary judgment).

### C.    Motion to Seal (ECF 44)

Last, the Court addresses KONE's motion to seal. ECF 44. Local Rule 105.11 provides

that "[a]ny motion seeking the sealing of . . . motions, exhibits[,] or other documents to be filed in

26

the Court record shall include (a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protection." (D. Md. 2025). The common law presumes that the public has a right to inspect judicial records and documents, though this may be outweighed by the parties' interest in sealing documents. *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 178, 180 (4th Cir. 1988).

KONE seeks to seal an exhibit attached to its motion for sanctions (ECF 42-10), which "contains confidential information regarding KONE customers." *Id.* at 1. KONE contends that this exhibit should be sealed pursuant to the parties' stipulated confidentiality order, ECF 41, because it "contains trade secrets or other confidential research, development, or commercial information which is in fact confidential." ECF 44, at 2. In light of that confidentiality order and noting no opposition on the record, the Court finds good cause exists to grant the motion to seal for the reasons noted in the motion. Accordingly, the Court will grant the motion to seal.

## IV.   CONCLUSION

For the foregoing reasons, KONE's motion for summary judgment is GRANTED; KONE's motion for sanctions is DENIED; and KONE's motion to seal is GRANTED.

A separate implementing order will issue.

Dated: June 12, 2026

/s/
Brendan A. Hurson
United States District Judge

27